**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

WEST VIRGINIA DEPARTMENT OF HEALTH &
HUMAN RESOURCES, BUREAU OF MEDICAL SERVICES,

        Plaintiff,

v.                           CIVIL ACTION NO.  2:11-cv-00327

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, et al.

        Defendants.

**MEMORANDUM OPINION AND ORDER**

On May 10, 2011, Plaintiff West Virginia Department of Health and Human Resources, Bureau of Medical Services ("Plaintiff" or "West Virginia"), filed a complaint in this Court seeking a declaration that the decision of the Department of Health and Human Services Departmental Appeals Board ("DAB" or "Board") disallowing West Virginia's claim for Federal Financial Participation ("FFP") in the amount of $2,298,329 was arbitrary and capricious, an abuse of discretion, and contrary to law.  (Docket 1 at 3.)  West Virginia also seeks an order setting aside DAB's decision and directing that Defendant United States Department of Health and Human Services ("Defendant" or "the Department") pay West Virginia's disallowed claim. (*Id.*)  On September 23, 2011, West Virginia filed a motion for summary judgment. (Docket 15.) On November 8, 2011, the Department filed a motion for summary judgment.  (Docket 17.)  For the reasons that follow, West Virginia's motion [Docket 15] is **DENIED**, the Department's

motion [Docket 17] is **GRANTED**, and this case is **DISMISSED** from the Court's active docket.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

In 1999, West Virginia developed a payment methodology for certain school-based health services ("SBHS") covered by Medicaid and rendered by its school districts to eligible students. The methodology categorized a number of services and calculated an interim reimbursement rate for each service based on the schools' costs of performing the services. There was no historical cost data available from the schools at the time West Virginia developed its methodology, so to obtain cost information from the schools, West Virginia (through a contractor, Pacific Health Group) sent paper surveys to the school districts. Based on the responses it received, which included only employee salaries and fringe benefits,[1] West Virginia developed interim reimbursement rates which would be paid to the schools, and in March 2000, the Department's Centers for Medicare and Medicaid Services ("CMS") approved an amendment to West Virginia's state Medicaid plan that incorporated the methodology developed by the State for reimbursing SBHS. Based on the payment rates West Virginia developed and submitted to CMS in seeking approval of its state plan amendment, the State submitted timely FFP claims for SBHS rendered for three calendar quarters spanning most of the 2000-2001 school year.

In 2002, West Virginia retained a second consulting firm, Public Consulting Group ("PCG"). In a report PCG presented to West Virginia on October 1, 2003, PCG stated it had "discovered that certain allowable costs have been omitted from the calculation" of West

---

[1] As DAB pointed out in its decision, West Virginia does not allege that indirect or operating cost data was sought from the schools in this 1999 survey.

Virginia's SBHS reimbursement rates since 2000. (Docket 11-1 at 112.) The allowable costs that had been omitted were certain "indirect and operating costs," which include qualifying costs for activities such as data processing and administrative tasks and for costs such as supplies, rents, and maintenance and repair costs. (*Id.*) To correct the exclusion, PCG extracted indirect and operating cost data from West Virginia's newly-implemented computer database, the West Virginia Education Information System ("WVEIS"), and recommended that West Virginia file a retroactive claim for FFP with the Department based on the higher reimbursement rates, which it posited would be accepted under one of the exceptions to the two-year limitations period. (*Id.* at 113, 125-26.) In a Medicaid expenditure report for the calendar quarter ending September 30, 2003, West Virginia filed a claim for additional FFP based on the upward rate adjustments suggested by PCG. The additional FFP sought represented West Virginia's SBHS expenditures claimed based on the "salaries and fringes only" rates, and the SBHS expenditures claimed based on the higher, all-inclusive rates. The total amount of additional FFP sought was $4,055,229, which represented $2,298,329 in added indirect and operating costs, and $1,756,900 in additional salary and fringe benefit costs that were greater than originally estimated in the State's initial FFP claim.

At the request of CMS, the Department's Office of Inspector General ("OIG") conducted an audit on whether West Virginia's supplemental FFP claim was timely, with specific focus on whether the claim qualified as an "adjustment to prior year costs." OIG concluded that the $1,756,900 which "reflected the settlement of previously identified salary and fringe benefit costs" met the definition of an adjustment to prior year costs, and it recommended to CMS that it allow these costs. OIG recommended to CMS that it disallow the remaining $2,298,329,

however, stating that the indirect and operating costs were not reflected in the initial FFP claim and therefore were not "later determined to be greater than originally claimed." CMS concurred with OIG's audit findings and recommendations, and it disallowed $2,298,329 in FFP for West Virginia's Medicaid program by letter dated January 22, 2010.

On March 19, 2010, West Virginia filed an administrative appeal to DAB challenging CMS's disallowance of the almost $2.3 million in FFP attributable to the initially unreported indirect and operating costs. On March 14, 2011, DAB upheld CMS's disallowance. As DAB's decision constitutes the final decision of the Secretary of Health and Human Services, West Virginia resorted to this Court on May 10, 2011. (Docket 1.) West Virginia's complaint alleges that DAB's decision upholding the disallowance is arbitrary and capricious and contrary to law. (*Id.* at 3.) West Virginia seeks a declaration that the decision is erroneous and a mandatory injunction directing the Department to pay West Virginia's $2.3 million claim attributable to the indirect and operating cost rate adjustment. (*Id.*)

## II.  STANDARD OF REVIEW

The Administrative Procedure Act ("APA") constrains the district court's scope of review in cases appealed from final agency action. Under the APA, a reviewing court shall set aside agency actions, findings of fact, and conclusions of law that are "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A). The APA further provides that the district court shall set aside agency actions "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" along with actions that are "without observance of procedure required by law." § 706(2)(C)-(D). Finally, the district court

must set aside any agency findings and conclusions that are "unsupported by substantial evidence . . . [appearing] on the record of an agency hearing . . . ." § 706(2)(E).

"Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envt'l Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (citing *Natural Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993)). The district court may not substitute its judgment for that of the agency; the agency action must be affirmed if there exists a rational basis for the decision. *See Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976) (cited with approval by *Aracoma Coal*, 556 F.3d at 192). In deciding whether the agency action is rational, as opposed to arbitrary and capricious, the district court must confine its review to the explanation "expressed by the agency itself and not supplied by the court." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

Although the district court's review of the agency decision is extraordinarily narrow in scope, the court must not resign itself to act as merely a "rubber stamp" for the agency action. *Aracoma Coal*, 556 F.3d at 192; *Ethyl Corp.*, 541 F.2d at 34. Instead, the district court is instructed to conduct "a 'searching and careful' inquiry of the record." *Aracoma Coal*, 556 F.3d at 992 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). This scrutiny of the record is meant primarily "to educate the court" so that it can "understand enough about the problem confronting the agency to comprehend the meaning of the evidence relied upon and the evidence discarded; the questions addressed by the agency and those bypassed; the choices open to the agency and those made." *Ethyl Corp.*, 541 F.2d at 36. In short, the court's review of the agency record is intended to inform it of the propriety of the agency's decision, not to enable the court to make its own decision.

5

"When a court reviews an agency's construction of a statute that it administers, [the court] employs the deferential standard of review articulated in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)." *EEOC v. Seafarers Int'l Union*, 394 F.3d 197, 200 (4th Cir. 2005). Under *Chevron*, the court must "ask whether the agency's rule is a permissible interpretation of its organic statute." *Id.* at 205.  The *Chevron* analysis proceeds in two parts. First, the court must ask "whether Congress has directly spoken to the precise question at issue," and "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Nat'l Elec. Mfrs. Ass'n v. U.S. Dept. of Energy ("NEMA")*, 654 F.3d 496, 504 (4th Cir. 2011) (quoting *Chevron*, 467 U.S. at 842-43).  If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.  In deciding whether to proceed to *Chevron*'s second step, the Supreme Court has instructed that "[f]ew phrases in a complex scheme of regulation are so clear as to be beyond the need for interpretation when applied in a real context." *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 418 (1992). The Fourth Circuit has proceeded to *Chevron*'s second step "where the statutory language 'neither plainly compel[led] nor clearly preclude[d] [an] interpretation,' because in such circumstances the 'precise import' of the language 'is ambiguous and certainly not free from doubt.'"  *NEMA*, 654 F.3d at 504 (quoting *United Seniors Ass'n v. Social Security Admin.*, 423 F.3d 397, 403 (4th Cir. 2005) (internal quotation marks omitted)).  Similarly, our court of appeals has reached *Chevron*'s second step after describing statutory language as "susceptible to more precise definition and open to varying constructions." *Md. Dep't of Health & Mental*

*Hygiene v. Ctrs. for Medicare and Medicaid Servs.*, 542 F.3d 424, 434 (4th Cir. 2008) (internal quotation marks omitted).

If a court determines that the statute is ambiguous on the precise question at issue, and therefore proceeds to *Chevron* step two, it must defer to the agency's interpretation "so long as the construction is a reasonable policy choice for the agency to make." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005) (internal quotation marks omitted). The court must "afford 'controlling weight' to an agency's reasonable interpretation even where we would have, if writing on a clean slate, adopted a different interpretation." *NEMA*, 654 F.3d at 504 (citing *Regions Hosp. v. Shalala*, 522 U.S. 448, 457 (1998)). The Fourth Circuit has added that "[t]he Medicaid statute is a prototypical 'complex and highly technical regulatory program' benefitting from expert administration, which makes deference particularly warranted." *West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Cir. 2007) (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

Moreover, the agency's interpretations of its own regulations are also entitled to substantial deference:

> In considering the Secretary's construction of [a regulation], we give "substantial deference to [the] agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. at 512. More precisely, "the agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Id.* (quoting *Udall v. Tallman*, 380 U.S. 1, 16-17 (1965) (other citations omitted)). Indeed, the Supreme Court has noted that deference to the Secretary's interpretations of Medicare regulations is "all the more warranted," because Medicare is "'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.' " *Id.* (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)). The agency's interpretation "need not be the best or most natural one by grammatical or other standards." *Pauley*, 501 U.S.

7

at 702.  Rather, it need only be "*a* reasonable construction of the regulatory language*." Thomas Jefferson Univ.*, 512 U.S. at 506 (emphasis added).

*Dist. Mem'l Hosp. of Sw. N.C., Inc. v. Thompson*, 364 F.3d 513, 517-18 (4th Cir. 2004) (citation styles modified).

In sum, then, if the statute at issue is ambiguous, then the agency regulation is entitled to substantial deference based on *Chevron* and the unique and complex nature of the Medicaid statute.  In addition, provided the agency's interpretation of its own regulation (for example, as provided in guidance manuals) is *a reasonable* one, it must be afforded controlling weight. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. at 512.

## III. APPLICABLE LAW

In its decision, DAB aptly provided general background on the federal Medicaid statute as follows:

> The federal Medicaid statute, title XIX of the [Social Security] Act, authorizes a program that furnishes medical assistance to low-income individuals and families. 42 U.S.C. § 1396.  The program is jointly financed by the federal and state governments and administered by the states.  § 1396b; 42 C.F.R. § 430.0.  Each state administers its Medicaid program in accordance with broad federal requirements and the terms of its "plan for medical assistance," which must be approved by the CMS on behalf of the Secretary of Health and Human Services. 42 U.S.C. § 1396a; 42 C.F.R. § 430.10-430.16.  The state plan must specify the medical or health-related services covered under the state's Medicaid program. See 42 U.S.C. § 1396a; 42 C.F.R. § 430.10.  A state with an approved Medicaid plan is eligible to receive federal matching funds, also known as "federal financial participation" (FFP), for a percentage of the Medicaid program expenditures it makes in accordance with the state plan.  42 U.S.C. § 1396b; 42 C.F.R. §§ 430.10(a), 433.15(a).  Medicaid FFP is distributed in quarterly grant awards.  42 C.F.R. § 430.30(a)(1).

(Docket 11 at 2) (citations altered).

42 U.S.C. § 1320b-2, which applies to Medicaid and various other programs in the Social Security Act, provides:

(a) Claims

Notwithstanding any other provision of this chapter (but subject to subsection (b) of this section), *any claim by a State for payment with respect to an expenditure made during any calendar quarter by the State--*

> *(1) in carrying out a State plan approved under subchapter* I, IV, X, XIV, XVI, *XIX*, or XX *of this chapter*, or

> (2) under any other provision of this chapter which provides (on an entitlement basis) for Federal financial participation in expenditures made under State plans or programs,

> *shall be filed (in such form and manner as the Secretary shall by regulations prescribe) within the two-year period which begins on the first day of the calendar quarter immediately following such calendar quarter*; and payment shall not be made under this chapter on account of any such expenditure if claim therefor is not made within such two-year period; *except that this subsection shall not be applied so as to deny payment with respect to* any expenditure involving court-ordered retroactive payments or audit exceptions, *or adjustments to prior year costs.*

§ 1320b-2(a) (emphasis added).  Subsection 1320b-2(a) thus establishes a general two-year limitations period for all claims filed by states for FFP dollars related to the administration of Medicaid programs.  The two-year period begins to run "on the first day of the calendar quarter immediately following" the calendar quarter in which a given Medicaid expenditure was made.  The purpose of the two-year claims requirement is to "ensure that states submit final reimbursement requests in a timely fashion so that [the Department] can plan its budget."  *Connecticut v. Schweiker*, 684 F.2d 979, 984 (D.C. Cir. 1982).  There are several exceptions to the two-year limitations period in subsection 1320b-2(a).  In light of the timely claims requirement's purpose, however, "the exceptions . . .  are intended to cover only 'extreme situations,'" and they are intended to "take care of those cases where it would be patently unfair

9

to a state to outlaw its claim merely because of the passage of time." *Md. Dep't of Health & Mental Hygiene*, DAB Decision No. 1909, 2004 WL 714960, at *4 (Feb. 10, 2004).

Most relevant to this case is the exception for "adjustments to prior year costs." The Department's regulations make clear that:

> The time limits in §§ 95.7 and 95.10 [prescribing 2-year limitations period for claims filed after 1979 and before 1979, respectively, which mirrors that in 42 U.S.C. § 1320b-2(a)] do not apply to any of the following—
>
> (a) Any claim for an adjustment to prior year costs.
>
> (b) Any claim resulting from an audit exception.
>
> (c) Any claim resulting from a court-ordered retroactive payment.
>
> (d) Any claim for which the Secretary decides there was good cause for the State's not filing it within the time limit.

45 C.F.R. § 95.19.  The regulations further state that:

> Adjustment to prior year costs means an adjustment in the amount of a particular cost item that was previously claimed under an interim rate concept and for which it is later determined that the cost is greater or less than that originally claimed.

*Id.* § 95.4.  Finally, the preamble to the regulation setting forth the definition of "adjustment to prior year costs" states:

> An "adjustment to prior year's costs" is limited to claims for services or medical assistance based on interim rates that subsequently are determined to be higher or lower than originally claimed. It has been our experience that in these areas subsequent adjustments are unforeseen and unavoidable. Consequently, we believe they should not be subject to the time limits. We believe that a broader exception would render the statutory provision a nullity. However, we would welcome comments based upon the actual experience of the commenters as to the desirability of expanding this exception.

*Time Limits for States To File Claims*, 46 Fed. Reg. 3527, 3528 (Jan. 15, 1981).  Nowhere in the statute or regulations is the phrase "cost item" defined.

*IV. ANALYSIS*

West Virginia argues that DAB's decision was arbitrary and capricious for essentially two reasons: (1) DAB disregarded relevant precedent and relied on inapposite precedent in reaching its decision; and (2) DAB made several factual findings that are not supported by substantial evidence.  (Docket 16 at 18-32.)

A.   *Defining "Cost Item"*

Regarding its first assignment of error, West Virginia argues that DAB "took the position that operating and indirect costs were separate 'cost components' that should have been claimed within two years, despite the State's evidence showing that these costs were unknown at the time the interim rates were set."  (*Id.* at 25.)  West Virginia goes on to argue that such a conclusion is not only unsupported by DAB precedent, it is contrary to DAB precedent.  (*Id.* at 25-32.)  First, it must be noted that DAB never concluded "cost item," as it is used in 45 C.F.R. § 95.4, means "cost component."  CMS adopted that definition of "cost item" prior to the agency appeal, and it is urged by the Department in the present case; however, as set forth in more detail below, DAB never passed on the precise definition of "cost item."[2]

---

[2]   West Virginia appears to acknowledge this fact elsewhere in its briefing, arguing, for example, that "[t]he Board failed to address the question of whether the operating and indirect costs at issue constituted new 'cost items' within the meaning of the . . . exception."  (Docket 16 at 18.) In fact, West Virginia takes the view that DAB's failure (or refusal) to expressly define "cost item" renders its decision arbitrary and capricious.  (*Id.* at 27.)  Thus, West Virginia is making the rather contradictory argument that DAB's decision was in error both for failing to resolve the question of what constitutes a "cost item" and for resolving that question in a manner that is contrary to law and DAB precedent.

11

Turning to substance, it is West Virginia's position that the term "cost item" as it appears in the regulations[3] means simply the interim rate, such that if an interim rate is timely claimed for the rendering of a given service, an adjustment to that interim rate is permissible beyond the two-year limitations period provided the costs underlying the rate change are still derived from rendering the same, previously-claimed service.  (Docket 16 at 21.)  As applied to the facts at hand, West Virginia argues that because it timely submitted a claim for reimbursement at an interim rate for SBHS, it is permitted to recalculate its interim rate, factoring in new costs and cost categories that were never previously claimed, beyond the two-year limitations period. The rationale underlying West Virginia's position is that all the claimed costs relate to rendering the same covered service, so any cost associated with those services factors into the (previously-claimed) reimbursement rate and thereby qualifies as the same "cost item" under the regulation.

In contrast, the Department argues that the term "cost item" means "cost component," such that only alterations to previously-claimed costs (as opposed to services) are permissible beyond the two-year limitations period.  (Docket 18 at 16.)  As applied to the facts of this case, the Department argues that West Virginia submitted a claim for SBHS that was based on an interim rate derived from several cost components, including teacher salaries and fringe benefits. Then, after the two-year limitations period expired, Plaintiff attempted to add costs that were never included in its initial interim rate, such as indirect and operating expenses (which include expenses such as rent and facility maintenance).  The Department maintains that the regulation's use of the phrase "cost item" means, in this case, that West Virginia may adjust only the salary and fringe benefit costs beyond the two-year limitations period; it may not add all new "cost

---

[3]   "Adjustment to prior year costs means an adjustment in the amount of a particular *cost item* that was previously claimed under an interim rate concept and for which it is later determined that the cost is greater or less than that originally claimed."  45 C.F.R. § 95.4 (emphasis added).

components" to the claimed reimbursement rate.  CMS adopted this view in affirming the disallowance of West Virginia's supplemental claim.  (Docket 11-1 at 54-56.)  However, DAB declined to resolve the issue of what "cost item" means, instead resting its decision on another aspect of the regulations and its precedent.

DAB's resolution of this case turned on its decisions in *Kansas Department of Social and Rehabilitation Services*, DAB Decision No. 2014, 2006 WL 517665 (Feb. 23, 2006), and *South Carolina State Health and Human Services Finance Commission*, DAB Decision No. 943, 1988 WL 486082 (Mar. 29, 1988),[4] as well as the Department's regulation and preamble at 46 Fed. Reg. 3527, 3528 (1981).  DAB initially looked to its decisions in *Kansas* and *South Carolina* and remarked that "both cases dealt 'with rate increases that resulted from the fact that a state deliberately did not include underlying costs of which it was aware either in its calculations of the interim rates for state [providers] or in cost settlements of those rates that it referred to as final.'"  (Docket 11 at 6.)  DAB further stated that "[t]he exception for adjustments to prior year costs is intended to cover unforeseen and unavoidable adjustments to account for differences between a final rate determined using actual allowable costs incurred in providing the services and the interim rates . . . ."  (*Id.* at 7.)  The requirement that adjustments to prior year costs be "unforeseen and unavoidable" is derived from the Department's regulation preamble, which provides:

> An "adjustment to prior year's costs" is limited to claims for services or medical assistance based on interim rates that subsequently are determined to be higher or lower than originally claimed. It has been our experience that in these areas subsequent adjustments are *unforeseen and unavoidable*. Consequently, we believe they should not be subject to the time limits. We believe that a broader exception would render the statutory provision a nullity. However, we would

---

[4]  These decisions are discussed in greater detail *infra*.

welcome comments based upon the actual experience of the commenters as to the desirability of expanding this exception.

*Time Limits for States To File Claims*, 46 Fed. Reg. 3527, 3528 (Jan. 15, 1981) (emphasis added).  DAB concluded that, like Kansas, West Virginia "sought to belatedly adjust its interim rates to account for categories of costs that it was aware of but chose not to include in the interim rate calculations . . . ."  (Docket 11 at 7.)  In other words, DAB concluded that West Virginia's reimbursement (and subsequent claim to CMS) of operating and indirect costs incurred by its schools in rendering SBHS was not an "unforeseen and unavoidable" subsequent adjustment.  DAB specifically found that, on the record before it, West Virginia "knew of the existence of SBHS-related operating and indirect costs but chose not to include any claim for them in its interim rates."  (Docket 11 at 7.)  Because West Virginia always intended to claim operating and indirect costs as a component of its reimbursement rates to schools for administering SBHS, DAB concluded that the adjustment to West Virginia's timely-claimed rate was not unforeseen and unavoidable, and the exception to the limitations period is inapplicable.  Applying the deferential standard of review required of the Court in this case, DAB's conclusion on this issue cannot be found arbitrary and capricious.  DAB's interpretation of the regulation appears consistent with the language of the regulation and the statute, as well as other language in the regulation, specifically the admonition that the "adjustment to prior year costs" exception is to be interpreted narrowly, else the limitations period itself will be rendered a nullity.  *See* 46 Fed. Reg. at 3528.

In a related argument, West Virginia states that reversal is warranted because "[t]he Board failed to address the question of whether the operating and indirect costs at issue constituted new 'cost items' within the meaning of the . . . exception."  (Docket 16 at 18.)  Both

West Virginia and the Department made arguments to DAB and to this Court based on the regulation codified in the *Code of Federal Regulations*:

> In this subpart [pertaining to time limits for states to file claims]—
>
> Adjustment to prior year costs means an adjustment in the amount of a particular cost item that was previously claimed under an interim rate concept and for which it is later determined that the cost is greater or less than that originally claimed.

45 C.F.R. § 95.4. In the parties' view, apparently, if a subsequent adjustment is deemed to be an alteration to "a particular cost item that was previously claimed," then the exception applies. DAB, however, has consistently employed an additional requirement or guiding principle—that the subsequent adjustment be "unforeseen and unavoidable"—which is derived from the regulation's preamble, located in the *Federal Register* and discussed above.[5] Apparently without deciding whether West Virginia's subsequent addition of indirect and operating costs to its SBHS rates met the definition of "cost item" in 45 C.F.R. § 95.4, DAB found the addition was foreseen and avoidable. On this basis, the adjustment was disallowed as untimely. As they are not clearly erroneous or contrary to the statute, the Secretary's regulations and her interpretations

---

[5] Although certainly not the interpretation of this Court, DAB's approach to the regulation at § 95.4 and its preamble in the Federal Register, and specifically the use of an additional "unforeseen and unavoidable" requirement, is "a reasonable construction of the regulatory language." *Thomas Jefferson Univ.*, 512 U.S. at 506; *accord Pauley*, 501 U.S. at 702 (agency's interpretation "need not be the best or most natural one by grammatical or other standards"). DAB's decision to interpret the preamble as guiding application of the exception and narrowing the circumstances in which it is to be employed is rational and reasonable, and it will not be disturbed. *Cf. S.C. Health & Human Servs. Fin. Comm'n v. Sullivan*, 915 F.2d 129, 131 (4th Cir. 1990) (upholding DAB disallowance based on the Board's finding that an adjustment was not "unforeseen and unavoidable," although DAB adopted West Virginia's definition of "cost item" in that case).

of those regulations are entitled to substantial deference.  DAB's choice to rest its decision on the

"unforeseen and unavoidable" requirement is therefore rational, and it will not be disturbed.[6]

### B.  DAB Precedent

West Virginia also urges the Court to recognize a distinction between adjusting an

interim rate to encompass new services and adjusting an interim rate based on the addition of

new costs for rendering the same services.  (Docket 16 at 24-32.)  This argument appears to be

an attempt to distinguish unfavorable DAB precedent, namely *Kansas* and *South Carolina*, and

to align the present case to the circumstances of a favorable DAB decision, *Pennsylvania*

*Department of Public Welfare*, DAB Decision No. 703, 1985 WL 259400 (Nov. 19, 1985).  The

Court will consider these cases in chronological order, since the decisions and their rationales

build upon one another.

In *Pennsylvania*, the State timely submitted claims to the Secretary for services provided

to patients in publicly-owned facilities during 1979 through 1981.  The years in question were

final cost-settled.   1985 WL 259400, at *2.  Pennsylvania later discovered that additional

provider costs were incurred during the years in question—namely rent paid to the responsible

public agency and bond charges for capital projects—which could be included in the State's

claim for federal Medicaid assistance.  *Id.*  The State claimed the omission of the rent and bond

costs occurred due to a lack of communication between the Pennsylvania General State

Authority, which was responsible for all construction at State facilities, and the health

department.  *Id.*  When Pennsylvania discovered that the rent and bond costs had not been

---

[6]  In fact, contrary to West Virginia's assertion elsewhere in its briefing that DAB "(implicitly) assumed" in this case that "cost items" means "cost components," it is quite possible that DAB's failure to expressly define "cost item" is because its decisions unanimously conclude that "cost item" refers to an interim rate (and not individual cost components) in circumstances like those in the present case.

included in the cost settlements or submitted in its claims for federal money, the State attempted to adjust its previously-submitted claims and argued for application of the "adjustment to prior year costs" exception. *Id.* The Health Care Financing Administration ("HCFA") (the precursor agency to CMS) disallowed the additional claim made by Pennsylvania, but DAB reversed, stating:

> In effect, [HCFA] viewed 'a particular cost item' in the regulatory definition to be the individual rental and bond charges, the smallest divisible item accumulated on the provider's cost report, rather than the per diem rate for a given service. [HCFA]'s position not only fails to consider the nature of an interim rate system but also conflicts with the State Medicaid Manual provision and the statement from the preamble of [the applicable] regulations.

*Id.* DAB found that the "cost item" in an interim rate system is the rate itself, not a particular item of cost:

> The particular cost items claimed were the expenditures (at the interim rate) for particular services provided by the facilities; these "cost items" were timely claimed. The State then merely adjusted the amount of that rate upward when the State determined that the rate claimed did not reflect all of the actual costs, and the rate should have been higher than what was originally claimed. As long as this type of adjustment was contemplated by the rate-setting system in Pennsylvania and was not prohibited by the State plan, we have no basis to find that these claims were not adjustments to prior year costs.

*Id.*, at *3. DAB continued to discuss and apply a previous, similar decision, *Ohio Department of Public Welfare*, DAB Decision No. 622, 1985 WL 259288 (Feb. 7, 1985):

> There, the Board found, as we do above, that the per diem rate for a given service is the "cost item," and, under [45 C.F.R. pt. 95], that rate can be adjusted for particular costs and the increases can be claimed after the two-year limit if a state's interim rate system allows such adjustments.

*Id.*

In *South Carolina*, decided three years after *Pennsylvania*, the State submitted supplemental claims in 1987 for "ancillary services" rendered in a state-run psychiatric hospital

17

during fiscal years 1979 through 1984.  1988 WL 486082, at *1-2/  Such costs were not made a part of the State's interim rates to the hospital, and the years were final cost-settled and closed prior to the supplemental claims.  *Id.*, at *2.  South Carolina was seeking the additional federal money for ancillary services because a consulting firm reviewed the State's reimbursement procedures and advised that ancillary services should be reimbursed under the Medicaid statute and the state plan and, in turn, claimed from the federal government.  *Id.*  Both HCFA and DAB disallowed the claims as untimely filed.  *Id.*, at *1.

South Carolina argued that the "adjustment to prior year costs" exception permitted its supplemental claim, relying on DAB's *Pennsylvania* and *Ohio* decisions, "where certain items of costs not included in an interim rate were considered in finding an adjustment to prior year costs, even though cost reports for those years had apparently been closed."  *Id.*, at *3.  However, in *South Carolina*, DAB specifically limited *Pennsylvania* and *Ohio* to "their particular facts," and stated that the exception would apply only when "a state later realize[s] that it ha[s] mistakenly not included costs of particular items in computing the final rate."  *Id.*, at *4.  DAB found that South Carolina did not fit this narrower view of the exception:

> [A]t the time it filed its original cost reports the [state run] hospital deliberately did not report any amount for ancillary services.  The State did not simply overlook or mistakenly not include these costs, rather it chose not to include these costs in its per diem rate calculation.  Thus there was no question of mistake or a lapse by the State in failing to include the ancillary costs on its original cost reports, as would more closely parallel the circumstances in *Pennsylvania* and *Ohio*.  Here, it was a conscious decision by the State not to claim these costs.

*Id.*  DAB also commented that the exception for adjustments to prior year costs is intended to give a state a reasonable opportunity to adjust its interim rate, provided the adjustment is made in

the course of the "state's interim and final cost settlement process." *Id.* (citing *Tenn. Dep't of Health and Env't*, DAB Decision No. 921, 1987 WL 343317 (Dec. 2, 1987)).

The *South Carolina* decision was appealed to federal district court in South Carolina and ultimately was appealed to and affirmed by the Fourth Circuit. *See S.C. Health & Human Servs. Finance Comm'n v. Sullivan*, 915 F.2d 129 (4th Cir. 1990). The court of appeals agreed with DAB that the phrase "cost item" as used in 45 C.F.R. § 95.4 "refers to the per diem rate and not the individual costs of particular services and [DAB] has in the past permitted state agencies to obtain reimbursement for particular cost items not included in the calculation of the interim billing rate." *Id.* at 131 (citing DAB's decisions in *Pennsylvania*, 1985 WL 259400, and *Ohio*, 1985 WL 259288). However, the Fourth Circuit also affirmed DAB's disallowance, stating:

> In both [*Pennsylvania* and *Ohio*], state agencies filed an adjustment for costs which they were not aware of when they had filed their interim claims. This fact distinguishes *Pennsylvania* and *Ohio* from this case. [South Carolina] knew at the time it calculated its interim billing rate what the ancillary services provided to patients at [the psychiatric hospital] cost. [South Carolina] did not make an interim cost estimate which excluded unknown ancillary services. Any exclusion [South Carolina] made was not related to a retrospective rate system because the costs of ancillary services were known to the [State] all along and could have been included in its cost report.

*Id.*

Finally, in *Kansas*, the State submitted a claim for federal Medicaid dollars in August 2002 for educational services rendered by psychiatric hospitals in the years 1994 to 1999. 2006 WL 517665, at *1. Kansas knew of the costs of providing the educational services all along, but a 1992 change in Medicaid law rendered states eligible for federal assistance on educational services. *Id.*, at *1-2. Kansas experienced some difficulty implementing the change in the law, and the State sought guidance and clarification from federal authorities on the scope of its

eligibility for federal money.  Kansas also waited and developed an "allocation methodology" for reporting the educational costs, which took nearly four years.  *Id.*, at \*2.  As a result, no claim was filed for educational services rendered by psychiatric hospitals until 2002 (although other services rendered at those hospitals had been timely claimed).  *Id.*

CMS disallowed the supplemental claim as untimely.  DAB affirmed the decision to disallow because "[t]he exception for adjustments to prior year costs is intended to cover unforeseen and unavoidable adjustments to account for differences between a final rate determined using actual allowable costs incurred in providing services and the interim rates estimated based on [historical data trended forward]."  *Id.*, at \*1.  Rather than finding Kansas' omission "unforeseen and unavoidable," DAB stated that "Kansas consciously excluded the educational costs when calculating both the interim rates . . . and when it first issued cost settlements for those years which it labeled 'final.'"  *Id.*  DAB cited the Fourth Circuit's decision in *South Carolina v. Sullivan*, explaining that "the exception for adjustments to prior year costs was designed to accommodate costs that were unknown to the agency at the time it calculated the rate."  *Id.*, at \*6.  From DAB's explanation in *Kansas*, by "unknown costs," it means costs of which the agency is *wholly unaware*, not simply costs of which the agency is aware but for which it is unable to accurately predict an amount:

> We see no material distinction between the situation in *South Carolina* and that here.  Both cases deal with rate increases that resulted from the fact that a state deliberately did not include underlying *costs of which it was aware* either in its calculations of the interim rates for state hospitals or in the cost settlements of those rates that it referred to as "final."  Kansas, like South Carolina, adjusted its interim rate not to include costs that it could not have included at the time it calculated *because it did not know they existed*—as is typical under a normal retrospective reimbursement system relying on historical data—but because of a subsequent policy decision to include costs that the State knew about but chose not to include.

*Id.*  Kansas also argued that DAB's decisions in *Pennsylvania* and *Ohio* applied to its situation, and consequently, the adjustment to prior year costs exception should apply.  DAB disagreed:

> [I]n *South Carolina*, we distinguished our *Pennsylvania* and *Ohio* decisions and expressly limited our holdings in them to the facts of those cases, that is, where the States *mistakenly omitted certain cost items* and then made adjustments permitted by their retrospective rate-setting systems.
>
> > [T]he principle of these cases should not be extended any further than their particular facts.  Where an interim per diem rate was claimed within two years, and then a state *later realized that it had mistakenly not included costs of particular items in computing the final rate*, the state can properly recompute its final rate to include the [mistakenly] omitted costs only if the state's retrospective rate-setting process permits it to re-open a final rate and the adjustment itself is one reasonably encompassed by the state's retrospective system.  Without this proviso, the rationale underlying the timely claiming requirements would be undercut so that any rate recalculation would be proper so long as a state had a retrospective system.
>
> The record here does not support a finding that Kansas "mistakenly" failed to include the educational services costs in its interim rate calculations.  Indeed, it is clear from the record that *Kansas knew the costs existed and that it could claim them under Medicaid but chose not to do so pending development of an allocation methodology.*  Kansas acknowledges that its "auditors did not include the [educational] costs in their preliminary and [final] settlements," but asserts that "they did so with the express intention and understanding that education costs would be added 'when the required documentation is available.'"  By stating its intent to include the [educational] costs at some future date, after development of a method for adequately documenting the costs, Kansas admits that it consciously excluded the costs . . . .

*Id.*, at *7 (quoting *South Carolina*, 1988 WL 486082, at *4) (emphases added).

In the present case, West Virginia, like Kansas, states it intended to submit a claim for indirect and operating costs all along, but it consciously excluded a claim for those costs pending development of a centralized and more efficient method of gathering historical cost information.  In its briefing to the Court, West Virginia represented that it considered estimating the indirect

21

and operating costs at the time of its initial claim but rejected that alternative because it feared over-estimating, which would lead to financial difficulties for its schools.  (Docket 16 at 15.) West Virginia concedes that there was no "mistaken omission" of the added costs in this case, even though DAB's decisions in *South Carolina* and *Kansas* expressly limit the adjustment to prior year costs exception to cases of mistaken omission in circumstances such as these. Contrary to West Virginia's contentions, then, it appears that *Kansas* is most like this case, and the Court, like DAB, is unable to find a reason for departing from *Kansas*' holding.

West Virginia attempts to distinguish *South Carolina* and *Kansas* by arguing that those decisions "involved situations where States retroactively sought to redefine the scope of the service provided to capture additional costs."  (Docket 16 at 28.)  In contrast, West Virginia argues that it (like the State in *Pennsylvania*) simply added costs associated with rendering the same services initially claimed.  (*Id.* at 29-31.)  In a roundabout way, then, West Virginia argues that the disallowances in *South Carolina* and *Kansas* were actually based on DAB's findings that the adjustments did not relate to the same "cost item," or service, although neither decision is couched in those terms.  However, it is clear to the Court that the disallowances in *South Carolina* and *Kansas* were upheld because, in each case, the State knowingly omitted certain costs from its reimbursement rate calculation, such that the later adjustment was not "unforeseen and unavoidable."  An "unforeseeable and unavoidable" adjustment is one that is either wholly unknown to the state at the time of its initial claim, *see Kansas*, 2006 WL 517665, at *6, or one that was "mistakenly omitted," *see id.*, at *7.  DAB found that neither circumstance was present in this case, and therefore, West Virginia's sought adjustment was not the kind of adjustment contemplated by the exception to the two-year limitations period.  As stated above, this rationale

is based on the regulation's preamble, and it was approved by the Fourth Circuit in affirming DAB's *South Carolina* decision.[7]  Neither DAB's rationale nor its reliance on *Kansas* and *South Carolina* are arbitrary and capricious, especially in light of the substantial deference which is due the Secretary's interpretation of ambiguous statutory law and her own regulations.

West Virginia urges the Court to reverse DAB's decision and to apply the *Pennsylvania* decision "exactly as written."   (Docket 16 at 26.)   It is West Virginia's position that *Pennsylvania* in no way turned on the fact that the state "mistakenly omitted" certain costs. Instead, West Virginia apparently argues that *Pennsylvania* stands for the proposition that any cost associated with a timely-claimed service may be submitted at the State's leisure.  However, as the Department rightly responds, whatever *Pennsylvania* said at the time it was issued,[8] *South Carolina* and *Kansas* made clear that *Pennsylvania* is limited to cases of "mistaken omission" of costs by the state, and it is therefore factually inapposite to the case at hand.

As a final point, West Virginia argues that it had good reason to refrain from including indirect and operating costs in its initial rates: the State did not have historical data on which to estimate the relevant costs.  (Docket 16 at 35-37.)  Again, West Virginia attempts to distinguish unfavorable DAB precedent, this time by pointing out that the State in *South Carolina* knew the amounts of the costs it omitted rather than simply that it was omitting a category of covered

---

[7]  The Fourth Circuit affirmed DAB and upheld the disallowance "because the costs of ancillary services were known to the [State] all along and could have been included in its interim cost report."   *Sullivan*, 915 F.2d at 130.   The court of appeals continued: "As the district court correctly noted, if a contrary position were adopted, the exception . . . would swallow up the two-year limitations rule . . . ."  *Id.*

[8]  West Virginia argues that "[DAB] did not base its holding or its reasoning in *Pennsylvania* on the fact that the State's omission was unintentional."  (Docket 16 at 26.)  While this is perhaps true of the four corners of the *Pennsylvania* decision, subsequent decisions from DAB make clear that *Pennsylvania* is limited to instances of mistaken omission.

costs. Although certainly appealing to one's sense of reasonableness, the legal significance of this argument is difficult to grasp. DAB's decision in *South Carolina* did not turn on the fact that the State omitted costs for which it had fairly accurate cost estimates, and the facts in *Kansas* indicate that the delay in submitting additional costs was due to the State waiting for more precise cost documentation to become available. Much like this case, the State in *Kansas* "knew the costs existed and that it could claim them under Medicaid but chose not to do so pending development of an allocation methodology," which was described as "a methodology for extracting, reporting and documenting [covered] costs." 2006 WL 517665, at *5, *7. DAB thus made clear that the pivotal aspect in determining whether an adjustment is indeed "unforeseen and unavoidable" is not whether the State has a cost figures available, but whether the State is aware that covered costs are being incurred and fails to timely submit those costs as a component of its reimbursement rates. This interpretation of the regulation and its preamble is eminently reasonable, and under the narrow review authorized by the APA, the Court will not reverse DAB's decision.

### C. DAB's Findings of Fact

West Virginia also argues that DAB "relied on several [factual] conclusions about the claims and West Virginia's claiming procedures . . . [that] were largely based on speculation and are inconsistent with the evidence in the administrative record." (Docket 16 at 32.) First, West Virginia alleges that DAB's "assumption that West Virginia could have obtained the necessary cost information within two years is inconsistent with the evidence before the Board." (*Id.* at 33.) Although not abundantly clear, this argument appears to challenge DAB's overall conclusion that West Virginia's sought adjustment for indirect and operating costs was not

"unforeseen and unavoidable," specifically by arguing that the prolonged delay in submitting those costs was indeed unavoidable because West Virginia had no accurate historical data due to its incomplete computerized cost-reporting system (WVEIS).  In other words, West Virginia argues that it had no choice but to submit untimely adjustments, and it challenges DAB's finding to the contrary.  In its decision, DAB considered West Virginia's argument and stated the following:

> West Virginia acknowledges that "[t]he interim rates [for SBHS] took into account the salary and other direct costs reported through the [1999] paper survey but did not include indirect and overhead costs, which could not be precisely calculated until [its computer system] was fully implemented [which occurred in 'late 2002']."  It is clear on the record that West Virginia, like Kansas, knew of the existence of SBHS-related operating and indirect costs but chose not to include any claim for them in its interim rates.  The development of the automated cost reporting system (WVEIS) may have made possible more precise calculations of the amounts of operating costs but that does not provide a reason that estimated figures were not or could not have been included in interim rates to reflect the asserted intention to treat such costs as part of the SBHS rates.  Moreover, West Virginia does not explain why, if [Public Consulting Group, West Virginia's second consulting firm] could obtain the published or indirect cost rates for SFY 2001 in SFY 2003, West Virginia could not have obtained the school districts' indirect cost rates for SFY 1999 (or an estimate of those rates) to use in the interim rate calculation.

> West Virginia does not contend that it was unaware of SBHS-related operating and indirect costs when it calculated its interim rates, nor has it shown that claiming the adjustment beyond the permitted two-year filing period was unavoidable despite reasonable diligence.  Furthermore, according to Mr. Brennan, the WVEIS was operational in "late 2002."  If so—and it is unclear what he means by "late" 2002—the State could have made rate adjustments before December 31, 2002, a date less than two years after the first of the three quarters subject to the disallowance.  Instead, the claimed adjustment was made beyond the two-year filing period suggesting that the delay was not based only on the lack of any earlier mechanism to gather accurate cost data.  The Board has held that exceptions to the two-year filing rule "do not apply to the routine situation where a state timely did not get around to getting its data together in time to file a claim within the statutory requirements."  *Maryland Dep't of Health & Mental Hygiene*, DAB Decision No. 1909, 2004 WL 714960, at *4 (Feb. 10,

2004) (internal quotation omitted).  A state has an obligation to gather the data necessary for FFP in a timely manner, and West Virginia did not do so here.

(Docket 11 at 7-8) (some citations omitted).

Thus, DAB made two factual findings to support its conclusion that West Virginia acted in a manner inconsistent with the timeliness exception for unforeseen and unavoidable adjustments: (1) West Virginia could have timely gathered the relevant information by means other than its computer system; and (2) West Virginia could have submitted timely claims based on the information in its computer system, which was fully functional in "late 2002."  West Virginia argues that its "school systems were not generating [cost] reports for operating and indirect costs at the time [West Virginia] calculated the interim rates," and it was therefore unable to include those costs in its interim rates.  (Docket 16 at 33.)  The State adds that "at the time West Virginia filed its initial claim for SBHS costs . . . [it] had only the results of a limited paper survey [which covered teacher salary and fringe benefit costs] conducted in 1999 at the direction of the State Department of Education."  (*Id.*)  Finally, West Virginia argues that DAB's assertion that relevant data could have been extracted from the WVEIS system after its complete implementation in "late 2002" and used to submit timely claims is "pure speculation."  (*Id.* at 34.)

Although the Court is unlikely to have made these findings itself, DAB's findings are supported by the record.  In its briefing before this Court, West Virginia admits that it "conservatively relied on . . . informal information (which covered salary and fringe benefit costs) in developing the interim rates because, at that time, it lacked better information . . . ."  (*Id.* at 33-34.)  The "informal information" to which West Virginia refers is data collected from a paper survey administered at the direction of the State Department of Education in 1999.  (See

Docket 11 at 187-88.)  DAB found that West Virginia could have sought indirect and operating cost data by means other than WVEIS, as it had salary and fringe benefit cost data.  This finding is one a reasonable mind might accept based on the record, and it is not weakened by West Virginia's contention that schools did not have that cost data available to them.  West Virginia never explained why schools were able to provide the relevant indirect and operating cost data in WVEIS but would not have been able to furnish the same information through another medium.[9] To the extent West Virginia responds that its schools were not compiling the data or its agencies did not timely seek the data by every reasonable avenue, DAB was fully justified in reciting the rule from its prior decisions that the exception does not apply "where a state timely did not get around to getting its data together in time to file a claim within the statutory requirements." *Maryland*, 2004 WL 714960, at *4.

To address West Virginia's claim that DAB's decision was "purely speculative" in finding that a claim could have been timely filed based on WVEIS data, the Court is constrained by the very limited standard of review applicable to this case.  The Court agrees with West Virginia that DAB's findings on the WVEIS implementation issue involve imprecision and guesswork, and the Court doubts it would have reached the same factual findings had it considered the matter in the first instance.  However, DAB's findings on this point emphasize that WVEIS was fully operational prior to the two-year deadline for the first of the three relevant quarters in this case.  This finding is fully supported by the record, which reveals only that WVEIS was up and running sometime in "late 2002."  West Virginia never elaborated on when

---

[9]   Moreover, if West Virginia was willing to use "limited and informal historical cost data available from the paper survey" to estimate salary and fringe benefit costs, why was it unwilling (or unable) to collect estimates from schools related to indirect and operating costs, no matter how "limited and informal" it may have been?

its system was fully functional, and the State never explained why it missed the three relevant deadlines, the latest of which was July 1, 2003, even with the benefit of its fully operational WVEIS system.  DAB's finding that there existed ample time between full implementation of WVEIS and the passage of the relevant deadlines to gather cost information is supported by substantial evidence in the record, such that a reasonable mind might accept this finding.[10]  *See Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) ("This Court has described the APA court/agency 'substantial evidence' standard as requiring a court to ask whether a 'reasonable mind might accept' a particular evidentiary record as 'adequate to support a conclusion.'") (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

West Virginia's second contention regarding DAB's findings of fact relates to the Board's conclusion that the subsequent inclusion of indirect and operating costs was not part of West Virginia's normal cost settlement process.  On this point, DAB found that West Virginia hired a consulting firm, PCG, "not . . . to review reported costs to identify errors or inconsistencies or to audit the records of the school districts to determine whether they correctly reported their annual costs," as would be the case if PCG was hired merely as an independent

---

[10]  At least as to the second and third of the three relevant quarters, the deadlines for which were April 1 and July 1, 2003, respectively, the Court has no trouble agreeing with DAB's findings that West Virginia had ample time to gather from WVEIS the relevant cost information.  As to the first deadline, however, which was January 1, 2003, it is difficult to assess the finding without information more precise than the "late 2002" implementation date West Virginia has supplied.  If by "late 2002" West Virginia means December 31, 2002, then DAB's finding would be wholly unsupported.  Conversely, if "late 2002" means October 1, 2002, then DAB's finding would be unequivocally supported.  On the record as it stands, however, the question for the Court is whether a reasonable mind might accept "late 2002" as adequate to support DAB's finding that West Virginia had ample time to gather and submit the relevant cost data.  Being mindful of the proper scope of review in this matter, as well as the simple fact that West Virginia is in the best position to come forward with more precise information regarding full implementation of its computer system, the Court will not overturn DAB's fact findings on this matter.

contractor to perform final cost settlements on the State's behalf.  (Docket 11 at 9.)  Instead, DAB found that West Virginia hired PCG to "'identify existing federal [revenue] sources which the [State] is either underutilizing or not maximizing all available federal funds' and to assist the State in recovering additional funds."  (*Id.* (citation omitted).)  DAB concluded that "the disallowed adjustments were not made for the purpose of reconciling estimated and actual costs—as would have been typical under a retrospective payment system."  (*Id.*)  The Court concludes that a reasonable mind would accept this record as adequate to support DAB's findings.  While the contract between PCG and West Virginia is worded broadly enough to cover cost settlements, DAB found that the contract was intended to assist West Virginia in locating and procuring unused federal dollars.  The record and the parties' courses of action amply support this finding.

## V.  CONCLUSION

Although reluctant to do so,[11] the Court **FINDS**  no grounds on which to set aside the decision of DAB.  Accordingly, West Virginia's motion for summary judgment [Docket 15] is **DENIED**, the Department's motion for summary judgment [Docket 17] is **GRANTED**, and this

---

[11] The Court is curious what decision DAB would have reached had West Virginia incorporated in its interim reimbursement rate calculation $1 for indirect and operating costs, thereby placing CMS on constructive notice of a forthcoming adjustment to its rates, and specifically to its schools' indirect and operating costs.  On the one hand, this scenario avoids the circumstance that DAB found so offensive: that West Virginia knew of the existence of such costs but remained entirely silent.  On the other hand, the subsequent adjustment still may not have passed the "unforeseen and unavoidable" requirement that appears to be so decisive in DAB's analysis.

Overall, this case presents a difficult question that is not squarely answered by the statute, the regulations, or prior decisions.  The parameters of the "adjustments to prior year costs" exception are less than clear, and the agency (as well as States required to navigate the timeliness guidelines) would be well-served by regulations that are more precise and straightforward, and grounded in sound policy.  West Virginia's argument that it would have been eligible for the exception had the State been entirely oblivious to the schools' indirect and operating costs is not lost on the Court, and it should not be lost on the agency, either.

case is **DISMISSED** from the Court's active docket.  A separate judgment order will enter this day.

   **IT IS SO ORDERED**.

   The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

        ENTER:  September 26, 2012

        THOMAS E. JOHNSTON
        UNITED STATES DISTRICT JUDGE